# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## TYLER DIVISION

| | | |
|---|---|---|
| **DEBRA A. WHITE** | § | |
| | § | |
| **vs.** | § | **CIVIL ACTION NO. 6:15cv841** |
| | § | |
| **COMMISSIONER, SOCIAL** | § | |
| **SECURITY ADMINISTRATION** | § | |

## MEMORANDUM OPINION AND ORDER

On September 10, 2015, Plaintiff initiated this lawsuit by filing a complaint seeking judicial review of the Commissioner's decision denying her application for Social Security benefits. The matter was transferred to the undersigned with the consent of the parties pursuant to 28 U.S.C. § 636. For the reasons discussed below, the Commissioner's final decision is **AFFIRMED** and the complaint is **DISMISSED** with prejudice.

## PROCEDURAL HISTORY

Plaintiff protectively filed an application for Disability Insurance Benefits on May 9, 2012, alleging a disability onset date of April 1, 2010. The application was denied initially and again on reconsideration. Plaintiff filed a request for a hearing before an Administrative Law Judge ("ALJ"). The ALJ conducted a hearing on February 7, 2014 and issued an unfavorable decision on April 17, 2014. The Appeals Council denied Plaintiff's request for review on July 13, 2015. As a result, the ALJ's decision became that of the Commissioner. Plaintiff then filed this lawsuit on September 10, 2015, seeking judicial review of the Commissioner's decision.

**STANDARD**

Judicial review of the denial of disability benefits under section 205(g) of the Act, 42 U.S.C. § 405(g), is limited to "determining whether the decision is supported by substantial evidence in the record and whether the proper legal standards were used in evaluating the evidence." *Bowling v. Shalala*, 36 F.3d 431, 435 (5th Cir. 1994) (quoting *Villa v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990)); *Muse v. Sullivan*, 925 F.2d 785, 789 (5th Cir. 1991) (*per curiam*). A finding of no substantial evidence is appropriate only where there is a conspicuous absence of credible choices or no contrary medical evidence. *Johnson v. Bowen*, 864 F.2d 340, 343–44 (5th Cir. 1988) (citing *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983)). Accordingly, the Court "may not reweigh the evidence in the record, nor try the issues *de novo*, nor substitute [the Court's] judgment for the [Commissioner's], even if the evidence preponderates against the [Commissioner's] decision." *Bowling*, 36 F.3d at 435 (quoting *Harrell v. Bowen*, 862 F.2d 471, 475 (5th Cir. 1988)); *see Spellman v. Shalala*, 1 F.3d 357, 360 (5th Cir. 1993); *Anthony v. Sullivan*, 954 F.2d 289, 295 (5th Cir. 1992); *Cook v. Heckler*, 750 F.2d 391, 392 (5th Cir. 1985). Rather, conflicts in the evidence are for the Commissioner to decide. *Spellman*, 1 F.3d at 360 (citing *Selders v. Sullivan*, 914 F.2d 614, 617 (5th Cir. 1990)); *Anthony*, 954 F.2d at 295 (citing *Patton v. Schweiker*, 697 F.2d 590, 592 (5th Cir. 1983)). A decision on the ultimate issue of whether a claimant is disabled, as defined in the Act, rests with the Commissioner. *Newton v. Apfel*, 209 F.3d 448, 455–56 (5th Cir. 2000); Social Security Ruling ("SSR") 96-5p.

"Substantial evidence is more than a scintilla but less than a preponderance—that is, enough that a reasonable mind would judge it sufficient to support the decision." *Pena v. Astrue*, 271 Fed. Appx. 382, 383 (5th Cir. 2003) (citing *Falco v. Shalala*, 27 F.3d 160, 162 (5th Cir. 1994)). Substantial evidence includes four factors: (1) objective medical facts or clinical findings; (2)

diagnoses of examining physicians; (3) subjective evidence of pain and disability; and (4) the plaintiff's age, education, and work history. *Fraga v. Bowen*, 810 F.2d 1296, 1302 n. 4 (5th Cir. 1987). If supported by substantial evidence, the decision of the Commissioner is conclusive and must be affirmed. *Richardson v. Perales*, 402 U.S. 389, 390, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971). However, the Court must do more than "rubber stamp" the Administrative Law Judge's decision; the Court must "scrutinize the record and take into account whatever fairly detracts from the substantiality of evidence supporting the [Commissioner's] findings." *Cook*, 750 F.2d at 393 (5th Cir. 1985). The Court may remand for additional evidence if substantial evidence is lacking or "upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." 42 U.S.C. § 405(g); *Latham v. Shalala*, 36 F.3d 482, 483 (5th Cir. 1994).

A claimant for disability has the burden of proving a disability. *Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991). The Act defines "disability" as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 416(i)(1)(A) and 423(d)(1)(A). A "physical or mental impairment" is an anatomical, physiological, or psychological abnormality which is demonstrable by acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B).

In order to determine whether a claimant is disabled, the Commissioner must utilize a five–step sequential process. *Villa*, 895 F.2d 1022. A finding of "disabled" or "not disabled" at any step of the sequential process ends the inquiry. *Id.*; see *Bowling*, 36 F.3d at 435 (citing *Harrell*, 862 F.2d at 475). Under the five–step sequential analysis, the Commissioner must determine at Step One whether the claimant is currently engaged in substantial gainful activity. At Step Two,

the Commissioner must determine whether one or more of the claimant's impairments are severe. At Step Three, the commissioner must determine whether the claimant has an impairment or combination of impairments that meet or equal one of the listings in Appendix I. Prior to moving to Step Four, the Commissioner must determine the claimant's Residual Functional Capacity ("RFC"), or the most that the claimant can do given his impairments, both severe and non–severe. Then, at Step Four, the Commissioner must determine whether the claimant is capable of performing his past relevant work. Finally, at Step Five, the Commissioner must determine whether the claimant can perform other work available in the local or national economy. 20 C.F.R. §§ 404.1520(b)–(f). An affirmative answer at Step One or a negative answer at Steps Two, Four, or Five results in a finding of "not disabled." *See Villa*, 895 F.2d at 1022. An affirmative answer at Step Three creates a presumption of disability. *Id.* To obtain Title II disability benefits, a plaintiff must show that he was disabled on or before the last day of his insured status. *Ware v. Schweiker*, 651 F.2d 408, 411 (5th Cir. 1981), *cert denied*, 455 U.S. 912, 102 S.Ct. 1263, 71 L.Ed.2d 452 (1982). The burden of proof is on the claimant for the first four steps, but shifts to the Commissioner at Step Five if the claimant shows that he cannot perform his past relevant work. *Anderson v. Sullivan*, 887 F.2d 630, 632–33 (5th Cir. 1989) (*per curiam*).

The procedure for evaluating a mental impairment is set forth in 20 CFR §§ 404.1520a and 416.920a (the "special technique" for assessing mental impairments, supplementing the five-step sequential analysis). First, the ALJ must determine the presence or absence of certain medical findings relevant to the ability to work. 20 CFR §§ 404.1520a(b)(1), 416.920a(b)(1). Second, when the claimant establishes these medical findings, the ALJ must rate the degree of functional loss resulting from the impairment by considering four areas of function: (a) activities of daily living; (b) social functioning; (c) concentration, persistence, or pace; and (d) episodes of

decompensation. 20 CFR §§ 404.1520a(c)(2–4), 416.920a(c)(2–4). Third, after rating the degree of loss, the ALJ must determine whether the claimant has a severe mental impairment. 20 CFR §§ 404.1520a(d), 416.920a(d). If the ALJ's assessment is "none" or "mild" in the first three areas of function, and is "none" in the fourth area of function, the claimant's mental impairment is "not severe, unless the evidence otherwise indicates that there is more than a minimal limitation in [the claimant's] ability to do basic work activities." 20 CFR §§ 404.1520a(d)(1), 416.920a(d)(1). Fourth, when a mental impairment is found to be severe, the ALJ must determine if it meets or equals a Listing. 20 CFR §§ 404.1520a(d)(2), 416.920a(d)(2). Finally, if a Listing is not met, the ALJ must then perform a residual functional capacity assessment, and the ALJ's decision "must incorporate the pertinent findings and conclusions" regarding the claimant's mental impairment, including "a specific finding as to the degree of limitation in each of the functional areas described in [§§ 404.1520a(c)(3), 416.920a(c)(3)]." 20 CFR §§ 404.1520a(d)(3) and (e)(2), 416.920a(d)(3) and (e)(2).

## ALJ'S FINDINGS

The ALJ made the following findings in his April 17, 2014 decision:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2015.

2. The claimant has not engaged in substantial gainful activity since April 1, 2010, the alleged onset date (20 CFR 404.1571 *et seq.*).

3. The claimant has the following "severe" impairments and other conditions: obesity, degenerative joint disease, hypertension, hyperlipidemia, arthritis, psoriasis, coronary artery disease, diabetes, major depressive disorder, and anxiety disorder (20 CFR 404.1520(c)).

4. I agree with the DDS consultants and the Medical Expert that the claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, and 404.1526).

5. After careful consideration of the entire record, I agree with the DDS consultants and the Medical Experts that the impairments reasonably result in a residual functional capacity to lift and/or carry 10 pounds occasionally and less than 10 pounds frequently, stand and/or walk for 2 hours in an 8-hour workday, and sit for 6 hours in an 8-hour workday. The claimant must avoid all ladders, ropes, or scaffolds and can only occasionally engage in all other postural functions. The claimant can understand, remember, and carry out detailed instructions, make detailed decisions, attend and concentrate for extended periods of 2 hours, interact adequately with coworkers and supervisors, and respond adequately to changes in routine work settings. No social restrictions interfere with the ability to work.

6. The claimant is capable of performing past relevant work as a tax clerk and title clerk. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565).

7. The claimant has not been under a disability, as defined in the Social Security Act, from April 1, 2010 through the date of this decision (20 CFR 404.1520(f)).

## ADMINISTRATIVE RECORD

Plaintiff's date of birth is November 25, 1957. She alleges a disability onset date of April 1, 2010. Plaintiff was 52 years old at the time of her alleged onset of disability. Plaintiff has an eleventh grade education and has relevant past experience as a claims clerk for the Cherokee County tax office, a seamstress, and a title clerk for a car dealership.

On August 5, 2008, Plaintiff visited Dr. Jan Garrett of Azalea Orthopedics with complaints of persistent left knee pain. Plaintiff's past surgical history at the time included a right shoulder surgery in 1999, a total hysterectomy in 2001, and a knee arthroscopy in 2004. The knee pain experienced by Plaintiff was reportedly dispersed medially and laterally within the knee. Plaintiff reported that weight bearing activities increased the pain though she had not noted any swelling or experienced any locking up and giving way in the joint. Dr. Garrett described Plaintiff as overweight, weighing 220 pounds, and noticed a modest limp in Plaintiff's gait. Dr. Garrett observed slight swelling, but no warmth or redness, in the left knee. Plaintiff maintained the ability to flex up to 130 degrees, though pain and crepitation accompanied the effort. Significant

tenderness was observed over the medial joint line. Previous imaging displayed significant arthritis in the left knee, primarily in the medial joint compartment. Dr. Garrett diagnosed Plaintiff with obesity and degenerative arthritis in the left knee with worsening symptoms.

Plaintiff saw Dr. Garrett again on a May 17, 2010, visit to Azalea Orthopedics in response to swelling in her left knee. It was a few weeks prior that Plaintiff had experienced the onset of the swelling in the knee and by the time of the appointment, this swelling had gone down. Dr. Garrett observed Plaintiff walking with a slight limp favoring the lower left extremity. Plaintiff's lower back displayed good motion and both hips showed full range of motion. Dr. Garrett saw minimal swelling over the lateral joint line of the left knee and found no real tenderness. Plaintiff could fully extend the knee and flex to 130 degrees with modest crepitation. In addition to the swelling of the knee, Plaintiff reported slowly worsening neuropathy symptoms including a decreased sensation in both calves above the ankles and down into the feet. Imaging showed a normal right knee but a narrowing in the medial joint compartment with only one millimeter of joint space remaining in the left. The patellofemoral joint exhibited moderate arthritic change. Dr. Garrett diagnosed Plaintiff with obesity, degenerative arthritis in the left knee with a recent flare up, and diabetes mellitus with peripheral neuropathy in both legs. Dr. Garrett advised Plaintiff to lose weight and recommended a cortisone injection, which Plaintiff declined.

On October 6, 2010, Plaintiff visited Dr. Matt Proctor at the Trinity Clinic Jacksonville for a follow up. Plaintiff did not report any pain. She stated, however, that she had experienced some depression which was exhibited through symptoms such as losing interest in usual activities, problems sleeping, and feeling fatigued. Plaintiff further reported changes in bowel habits. Aside from her obesity, with a BMI of 40.48, the rest of her examination was within normal limits. Dr. Proctor diagnosed Plaintiff with controlled type II diabetes mellitus, stable hyperlipidemia, stable

postmenopausal status, stable dyshidrotic eczema in the hands, and depression. For the depression, Plaintiff was started on Celexa and instructed to undertake counseling.

Plaintiff revisited Dr. Proctor on January 11, 2011, for a follow up on her diabetes mellitus. Plaintiff noted that she was not checking her blood sugar as often as she should. Plaintiff denied changes in vision and reported that she was starting a diet and exercise program. Plaintiff's hyperlipidemia was being treated with Vytorin and she was tolerating it well. She stated that her depression was doing better but she was still having issues with motivation. In her physical exam, Plaintiff was noted as obese with a BMI of 41.42 while everything else was recorded as normal. Dr. Proctor diagnosed Plaintiff with uncontrolled type II diabetes mellitus, stable hyperlipidemia, and depression, for which her medication was increased.

Plaintiff returned on March 1, 2011 complaining of an earache, a sore throat, congestion, headache, and a temperature of up to 100.2°F.  Plaintiff was diagnosed with sinusitis and she was prescribed medication.  At a routine follow up on July 13, 2011, Plaintiff denied pain and stated that she was doing well with regard to her hyperlipidemia and depression. She reported that she had recently been to the emergency room for possible cellulitis. The visit was spurred by swelling and erythema to the right lower extremity. She reported that she had experienced pain, but was doing better despite some erythema from time to time. Besides obesity with a BMI of 42.85, Dr. Proctor found nothing significant in the review of systems or the physical exam. Dr. Proctor opined that Plaintiff's depression seemed to be improved but her hyperlipidemia was uncontrolled, so he prescribed Lipitor.

Plaintiff visited the Trinity Clinic Jacksonville again on January 6, 2012, with complaints of congestion and cough. Plaintiff rated her chest pain as a five out of ten and stated that the onset of her congestion and cough had been in the past week. She denied a sore throat or ear pain. A

physical examination was positive for rhinitis. Plaintiff was diagnosed with an acute upper respiratory infection and she was prescribed medication.

On February 6, 2012, Plaintiff returned to Dr. Proctor for her annual visit. Plaintiff was experiencing a headache at the time of the appointment and rated the pain as a five out of ten. Plaintiff stated that her diabetes and lipids were doing well, however, she continued to feel depressed. Plaintiff reported that she had no energy, did not feel like doing anything, could not wait to get back home when she goes out, and lacked substantial sleep, but she did not have suicidal desires. Dr. Proctor opined that Plaintiff was due for a mammogram, Pap test, and colonoscopy. He counseled Plaintiff to quit or decrease smoking from her average of one pack per day. Her physical exam was normal aside from obesity with a BMI of 41.42. Plaintiff was diagnosed with uncontrolled depression, controlled diabetes mellitus, and stable hyperlipidemia. She was prescribed medication and Dr. Proctor further advised Plaintiff to get a mammogram and colonoscopy.

Plaintiff returned to Dr. Garrett at Azalea Orthopedics on February 9, 2012, reporting very good improvement in her left knee while taking Meloxicam. Plaintiff requested a refill of that prescription. During the examination, Dr. Garrett observed no limp in Plaintiffs walk, full motion in the back and hips, and minimal tenderness in the left knee. Plaintiff could fully extend the knee and flex to 130 degrees. Straight leg raises were negative bilaterally and swelling was not observed in the left calf or foot. Dr. Garrett diagnosed Plaintiff with degenerative arthritis in the left knee, though it was deemed stable on Meloxicam.

Plaintiff was hospitalized on June 6, 2012, with complaints of chest pain. From the emergency department in Jacksonville, Plaintiff was transferred to Trinity Mother Frances in Tyler. There she received a left heart catheterization on June 8, by Dr. Oscar Paniagua. He noted

that Plaintiff demonstrated high-grade distal left main disease with preserved left ventricular ejection fraction of 60% , as well as high-grade ostial lesions of the posterior descending branch of the right coronary artery. Plaintiff also received urgent aortocoronary bypass grafting times three by Dr. Neelan Doolabh. Dr. Doolabh discharged Plaintiff on June 14, 2012, with discharge diagnoses of coronary artery disease including significant left main component, status post-surgical revascularization, unstable angina, acute postoperative hypoxemic respiratory failure secondary to acute exacerbation of chronic bronchitis, bibasilar atelectasis, bronchorrhea, and COPD, diabetes mellitus type 2, controlled, hypertension, dyslipidemia, depression, acute postoperative blood loss anemia, stable morbid obesity, and debilitation.

On June 22, 2012, Plaintiff returned to Dr. Doolabh for a two-week surgical follow up at the Trinity Clinic. Plaintiff reported that she was feeling well and denied pain. A physical examination revealed only her surgical chest wound, which was not significant, and a BMI of 41.07. Plaintiff was instructed to return in six weeks. Plaintiff returned on July 23, 2012 and denied pain. She had no complaints, stating that she was feeling well. Dr. Doolabh's physical examination revealed that the sternum was stable and healing well. Aside from a BMI of 41.42, the examination was unremarkable.

On August 9, 2012, Plaintiff had a follow up appointment with Dr. Proctor. Dr. Proctor opined that Plaintiff was managing her diabetes well and Plaintiff denied any pain. Dr. Proctor's examination found a BMI of 41.25 and a relatively high lipid count, while everything else was unremarkable. Dr. Proctor diagnosed Plaintiff with stable and benign essential hypertension, stable coronary artery disease, controlled diabetes mellitus, and uncontrolled hyperlipidemia.

Plaintiff visited Bill W. Shelton, Ph. D., on November 3, 2012, for a clinical interview and mental status examination. At the interview, Plaintiff reported that she realized she was depressed

in April 2010 after being rude to a customer resulted in her termination from her job. Since around that date, she has been taking Prozac. She stated that she was able to independently complete daily activities though she sometimes needed her husband to remind her to take her medications. Plaintiff indicated that she could cook, do household chores if she could make herself get up, shop, manage her money. After her heart attack, Plaintiff indicated that she was scared of going outside alone. Plaintiff stated that she did not regularly participate in scheduled social activities, though she had been attending church, and that she has difficulty with her memory and in concentrating. She reported that though she was more forgetful at this point than she was a year ago, she was no longer as tearful.

Dr. Shelton's examination found that Plaintiff had unremarkable hygiene, had no limp, became tearful several times, had understandable speech, asked relevant and coherent questions, denied suicidal thoughts, denied hallucinatory experiences, was nervous, and had only minor issues with cognition. Dr. Shelton diagnosed Plaintiff with moderate and recurrent major depressive disorder, without psychotic features. Dr. Shelton also determined that Plaintiff had a GAF score of 50 to 55.

Dr. Matthew Vierkant performed a consultative examination of Plaintiff on November 13, 2012. Dr. Vierkant noted Plaintiff's June surgery and her good recovery. Plaintiff denied any other complications stemming from her diabetes. Plaintiff noted some discomfort in her hip and hypothesized that it may be a result of how she walks in response to knee pain. Upon physical examination Plaintiff showed no signs of acute distress, her heart had regular rate and rhythm, and her surgical scar was well-healed. The abdominal area was noted as obese, benign, non-tender, and non-distended. Dr. Vierkant observed full range of motion in the back, straight leg raises were negative bilaterally, and crepitus was noted in the left knee while the right knee was unremarkable.

Plaintiff maintained good internal and external rotation of the hip and exhibited the ability to lie down, sit up, and move about by herself. Dr. Vierkant observed a slight limp in the left leg and Plaintiff was unable to walk on her toes or heels. Dr. Vierkant diagnosed Plaintiff with coronary artery disease, ongoing nicotine addiction, diabetes, hypertension, hyperlipidemia, a history of depression and psoriasis, chronic left knee pain, and obesity.

A state agency physician, Dr. George Carrion, completed a physical residual functional capacity assessment on November 20, 2012. Dr. Carrion determined that Plaintiff could lift and carry 10 pounds occasionally, lift and carry less than 10 pounds frequently, stand and walk with normal breaks for at least two hours in an eight-hour workday, and sit with normal breaks for a total of about six hours in an eight-hour work day. He opined that Plaintiff did not have any manipulative, visual, communicative, or environmental limitations, but her postural limitations include occasional climbing of ramps/stairs, kneeling, crouching and crawling and never climbing of ladders/rope/scaffolds.

On November 26, 2012, another state agency consultant, Norvin Curtis, Ph.D, completed a Psychiatric Review Technique and a Mental Residual Functional Capacity Assessment. Based on his review of the medical records, Dr. Curtis opined that Plaintiff's depression and anxiety result in moderate limitations in her ability to maintain social functioning and concentration, persistence or pace, and mild limitations in her activities of daily living, with no episodes of decompensation. His mental RFC for Plaintiff does not show Plaintiff to be markedly limited in any category. He assessed Plaintiff as moderately limited in the ability to understand and remember detailed instructions, carry out detailed instructions, maintain attention and concentration for extended periods, work in coordination with or proximity of others without being distracted by them, complete a normal workday and workweek without interruptions from

psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods and to get along with coworkers or peers without distracting them or exhibiting behavioral extremes. Dr. Curtis' opinion was affirmed by Dr. Mark Schade on January 28, 2013.

Another state agency physician, Dr. Yvonne Post, completed a physical residual functional capacity assessment on January 28, 2013. In reviewing Plaintiff's impairments from February 1, 2012 to the date of the assessment, Dr. Post opined that Plaintiff could occasionally lift 20 pounds, frequently lift 10 pounds, stand and/or walk for at least 2 hours in an 8-hour workday, and sit with normal breaks for about 6 hours in an 8-hour workday. She included an additional limitation that Plaintiff could only stand/walk combined together for 4 hours in an 8-hour workday. Dr. Post did not find any manipulative, visual, communicative or environmental limitations but she determined that Plaintiff's postural limitations are all limited to occasional.

After waking up to chest pain on February 22, 2013, Plaintiff went to the emergency room. Plaintiff stated that the pain was not originally very bad but as she started moving around it worsened. Plaintiff reported pain radiating down her left arm into her neck, symptoms similar to those she experienced prior to her double bypass surgery. Dr. Price's evaluation found Plaintiff positive for chest tightness, shortness of breath, and chest pain but negative for palpitations and leg swelling. Dr. Price did not identify any acute or new abnormality and diagnosed Plaintiff with chest pain upon exertion.

On March 5, 2013, Plaintiff visited Dr. Garrett complaining of right knee pain. Plaintiff reported that she had fallen a month earlier and had since experienced pain in that knee, though the pain in her left knee was stable. She stated that she had noticed popping with the use of the right knee and the tendency of the knee to give way but no definite locking. Plaintiff denied lower

back and hip pain. Upon examination, she was moderately obese, had a good motion of the lower back, no sign of swelling, warmth or redness in the right knee, but displayed significant tightness in the location. Dr. Garrett diagnosed Plaintiff's right knee with possible synovitis and internal derangement. The left knee was diagnosed with degenerative arthritis. Plaintiff underwent a cortisone injection in the right knee. At that time, Plaintiff stated that she was not interested in pursuing total left knee replacement.

Plaintiff visited Dr. Garrett again on April 1, 2013, reporting that her left knee was giving way and causing her to fall. Plaintiff stated that one such instance had occurred on March 21, 2013. Three days after the incident, her knee locked up again causing her to fall once more. She claimed that the pain was now worse in that knee. Upon examination, Plaintiff was noted to walk with a limp favoring the lower left extremity and she complained of pain when rising from and sitting down into a chair. Imaging showed marked narrowing of the medial joint compartment with a varus deformity consistent with degenerative arthritis. Dr. Garrett diagnosed Plaintiff with degenerative arthritis in the left knee and a contusion of the left patella which was a likely fracture. Plaintiff was administered a cortisone injection, agreeing with Dr. Garrett that if the injection failed, a total joint replacement would be needed within the year. She was told to return in six weeks.

Plaintiff presented to Dr. Garrett at Azalea Orthopedics on September 3, 2013, concerning the general worsening of all her left knee arthritic symptoms. Plaintiff stated that the last cortisone injection did not help her very much and that the pain was aggravated by any weight-bearing activity. She reported no major swelling but that she did use a cane to ambulate. Upon examination, Plaintiff showed normal hip motion, a decreased sensation in both feet, an inability to fully extend her knee, and some swelling in the left calf. Imaging showed significant narrowing of the medial

joint compartment of the left knee with bone nearly touching bone. Dr. Garrett recommended total knee replacement surgery, to which Plaintiff agreed.

On October 17, 2013, Dr. Albert Stephen of Trinity Mother Frances Hospital saw Plaintiff for a preoperative evaluation of her left knee. Plaintiff stated that aching pain was present in her left knee and had been increasing. Included among the symptoms she listed were loss of motion but not loss of sensation, muscle weakness, numbness, or tingling. She reported her symptoms to be aggravated by movement and weight bearing activities. Dr. Stephen's examination proved unremarkable other than some joint swelling, arthralgias, and a gait problem. He diagnosed Plaintiff with severe osteoarthritis of the left knee, controlled type two diabetes mellitus, controlled hypertensive disorder, stable coronary artery disease, and stable hyperlipidemia.

Dr. Garrett performed a computer-assisted left total knee joint on November 1, 2013. The surgery had no complications. On November 10, 2013, Plaintiff saw Dr. Clinton Carter of Trinity Mother Frances. Plaintiff was doing rehab with a continuous passive motion machine but it was noted that the pain was being poorly controlled and she was falling behind on her range of motion according to her physical therapist. Plaintiff complained of pain in the left knee and left thigh. Described as severe, she stated that the pain had been constant and had caused lack of motion but not numbness. Upon examination, apart from a weight of 227 pounds, decreased range of motion, and swelling in the left knee, all else was unremarkable. Plaintiff's pain medication was increased. On December 18, 2013, Plaintiff saw Dr. Garrett for her six weeks post-operation checkup. Dr. Garrett's examination showed improving range of motion, full extension of the knee, and no real limp. Plaintiff stated that the pain was much better.

On January 1, 2014, Plaintiff visited Dr. Proctor with complaints of cough and congestion that had persisted for two weeks. She reported a sore throat, some facial pressure, and dental pain.

Plaintiff had fever and fatigue. Plaintiff was diagnosed with sinusitis and she was prescribed medication.

Plaintiff was seen at Azalea Orthopedics on January 20, 2014. She stated that her left knee was doing great aside from some popping occasionally within the joint space and that she had returned to her activities of daily living. Imaging showed good position and no complications. Plaintiff arose from her chair without support and walked around the room without a limp. The left knee showed no swelling or tenderness and Plaintiff could fully extend her knee. Dr. Garrett opined that Plaintiff was making good progress. Plaintiff was instructed to continue her regular routine and to exercise.

On March 24, 2014, Plaintiff visited Dr. Proctor at Trinity Mother Frances for a check up on her conditions. Plaintiff denied symptoms of hypertension and hyperlipidemia, but she reported some neuropathic issues, believed to be related to her diabetes. She reported no cardiovascular symptoms. Plaintiff stated that she was experiencing major issues with motivation. Dr. Proctor's examination of Plaintiff was unremarkable in all categories aside from her weight at 230 pounds. She was continued on all current medications. In addition, she was started on Neurontin for neuropathy.

Plaintiff testified at her hearing before the ALJ on February 7, 2014. She testified that she had not worked at all since April 2010 when she left her job as a claim clerk in the Cherokee County tax office. While working at the tax office, Plaintiff's duties included registering vehicles. Plaintiff testified that she could no longer stand on her feet, had bad legs, suffered from a great amount of depression, and had a bad memory.

Plaintiff testified about her history of knee problems. Her job as a claim clerk had required her to stand up and sit down a lot. She stated that it was this movement that led to a torn meniscus

in her left knee forcing her to have it scoped in 2004. Plaintiff testified that she experienced pain during walking, causing her to utilize a walking aid prior to her 2013 left knee replacement surgery. Following this surgery, Plaintiff abandoned the walking aid though she did still feel a little pain. She testified that her doctor told her this would be normal for a time after the surgery. Plaintiff stated that she could now stand in one place for 45 minutes before her knees and hips began to hurt.

When asked about her depression, Plaintiff testified that she was currently taking Prozac, as prescribed by Dr. Proctor, to address the issue. She stated that she originally believed the medicine was working but she was no longer sure. Plaintiff expressed that she had crying spells, was afraid of going outside alone, could not sit through a two-hour movie, experienced problems with memory, and did not sleep very well. During the testimony, Plaintiff could not name any symptoms stemming from her heart problems, but she stated that she was taking Aspirin, Lipitor, Metoprolol, and Lisinopril. When asked about other conditions that preclude her from work, Plaintiff asserted that her diabetes sometimes caused her feet to become burning cold.

Plaintiff's husband, Larry White, testified at Plaintiff's hearing. Mr. White stated that he had been married to Plaintiff for 16 years and was employed as a machine operator. He testified that he sometimes has to remind Plaintiff to engage in daily activities such as getting dressed or doing the laundry. Mr. White testified that he will see Plaintiff begin tasks but then forget to finish them. Mr. White stated that he sometimes noticed Plaintiff having trouble walking around and experiencing pain.

A medical expert, Dr. Murphy, also testified at Plaintiff's hearing. Dr. Murphy was read the recommendations of Dr. Polk during his testimony. Dr. Polk indicated that Plaintiff could lift 20 pounds occasionally, ten pounds frequently, stand and walk for two hours out of an eight hour

work day, sit for six, occasionally climb ramps, stairs, ladders, scaffolds, balance, stoop, and occasionally kneel, crouch, and crawl. Dr. Murphy said he would modify this account only to decrease the weights Plaintiff could lift and encourage her to avoid all ladders, ropes, and scaffolds. Dr. Murphy further testified that Plaintiff was at the sedentary level of exertion.

A second medical expert, Mr. Bentham, testified at Plaintiff's hearing. The ALJ read Dr. Curtis' evaluation stating that Plaintiff could understand, remember, and carry out detailed instructions, make detailed decisions, concentrate for extended periods, interact with co-workers and supervisors, and respond appropriately to changes in the work setting. Mr. Bentham testified that he would modify this to adjust to her problems with pace, concentration, and persistence, though clarifying that Plaintiff would still maintain the capacity to perform simple work. Mr. Bentham stated that he would not include any social limitations on Plaintiff.

A vocational expert, Mr. Bowden, also testified at Plaintiff's hearing. Mr. Bowden testified that Plaintiff last worked as a claim clerk, which has an SVP of 4 and is semi-skilled and sedentary. This position, however, would require Plaintiff to be on her feet at least two hours in an eight hour work day answering questions and talking to individuals at the desk. Prior to this position, Plaintiff worked as a seamstress in the manufacturing setting, unskilled, SVP of 2, and light exertional requirements. Before that, Plaintiff worked as a title clerk for a car dealership, semiskilled, SVP of 4, and sedentary.

Following this portion of the testimony, Dr. Bentham testified again. He expressed that according to Dr. Curtis' analysis of Plaintiffs mental capacity, Plaintiff is able to understand, remember, and carry out detailed instructions, make detailed decisions, concentrate for extended periods, interact with co-workers and supervisors, and respond to changes in routine. Accordingly,

Dr. Bentham testified that she would be able to carry out detailed, but not complex, instructions. He believed that Plaintiff could go back to her previous position as a claims clerk.

Mr. Bowden resumed his testimony stating that in order to find out if there is an actual difficulty for her to resume this work, Plaintiff would need to go back to that job for a trial period. He testified that within five days, it would be clear whether or not she possessed the residual functional capacity to resume this type of work. Mr. Bowden continued, expressing that if Plaintiff could not maintain focus for a two hour test period, she would be precluded from that job and a competitive work environment.

## DISCUSSION AND ANALYSIS

In her brief, Plaintiff asserts two issues for review. Plaintiff alleges that the ALJ's credibility finding is contrary to law. Plaintiff submits that the ALJ's finding is inconsistent because he found her to be honest and sincere, yet also found her allegations not entirely credible. Plaintiff additionally argues that the testimony of the medical expert, Dr. Bentham, concerning her mental limitations is not substantial evidence supporting the ALJ's decision. Plaintiff asserts that there is a conflict between Dr. Bentham's opinion that Plaintiff can perform simple work and his conclusion that Plaintiff could perform her past, detailed work. Plaintiff also contends that it was improper for the ALJ to ask Dr. Bentham to opine as to whether Plaintiff could perform her past work.

*Credibility*

In his decision, the ALJ considered Plaintiff's symptoms together with the objective medical evidence within the framework of 20 C.F.R. § 404.1529 and SSR 96-7p. Both 20 C.F.R. § 404.1529 and SSR 96-7p[1] emphasize that subjective symptoms must be supported by some

---

[1] SSR 96-7p was in effect at the time this lawsuit was filed. It was later superseded by SSR 16-3p.

objective medical evidence to support a disability finding.  A claimant's statements concerning the intensity, persistence and limiting effects of her symptoms will be evaluated by the Commissioner "in relation to the objective medical evidence and other evidence."  20 C.F.R. § 404.1529. Simiarly, SSR 96-7p states that "[n]o symptom or combination of symptoms can be the basis for a finding of disability, no matter how genuine the individual's complaints may appear to be, unless there are medical signs and laboratory findings demonstrating the existence of a medically determinable physical or mental impairment(s) that could reasonably be expected to produce the symptoms."

The ALJ employed a two-step process: (1) to determine whether there is an underlying medically determinable physical or mental impairment—i.e., an impairment(s) that can be shown by medically acceptable clinical and laboratory diagnostic techniques—that could reasonably be expected to produce the claimant's pain or other symptoms, in theory, and if that is shown, (2) to evaluate the intensity, persistence, and limiting effects of Plaintiff's symptoms to determine the extent to which they limit her functioning.  SSR 96-7p.  After thoroughly considering and discussing all of the relevant medical evidence on record regarding Plaintiff's physical and mental impairments and the Plaintiff's statements, the ALJ concluded that "the medically determinable impairments cannot reasonably cause the level of symptoms alleged by the claimant."[2]  The ALJ evaluated and explained the weight given to each medical opinion.  The ALJ also noted that a disability determination requires objective medical evidence of an impairment that could reasonably be expected to produce the symptoms, "no matter how genuine the individual's complaints may appear to be."[3]  Plaintiff does not cite any case law finding that it is improper to consider a claimant to be honest and sincere, yet find that her allegations concerning the severity

[2] *See* Administrative Record, ECF 11-3, at *25.
[3] *Id.* (citing SSR 96-7p).

of her limitations is not entirely credible when considered in conjunction with the objective medical evidence. Plaintiff's assertion that the ALJ cannot find her to be genuine and sincere, yet not entirely credible, lacks merit.

In addition, Plaintiff's assertion in her brief that the ALJ failed to consider her mental impairments lacks merit. The ALJ's RFC analysis specifically considered the medical evidence from Dr. Curtis, Dr. Schade, and Dr. Bentham, as well as Plaintiff's statements concerning her daily activities and concentration, persistence and pace. The ALJ's RFC finding addressed Plaintiff's mental impairments by finding that she can understand, remember, and carry out detailed instructions, make detailed decisions, attend and concentrate for extended periods of 2 hours, interact adequately with coworkers and supervisors, and respond adequately to changes in routine work settings. The ALJ explained that he assigned a limitation of "moderate" in the area of concentration, persistence, and pace to limit Plaintiff to detailed work, consistent with Dr. Bentham's opinion.

*Medical Expert*

Plaintiff next argues that the ALJ improperly relied on the opinion of Dr. Bentham, a testifying medical expert. Plaintiff asserts that Dr. Bentham's testimony was inconsistent and that the ALJ improperly asked Dr. Bentham to testify concerning whether Plaintiff could perform her past work.

At the hearing, the ALJ asked Dr. Bentham whether he agreed with Dr. Curtis' statement that Plaintiff can understand, remember, and carry out detailed instructions, make detailed decisions, concentrate for extended periods, and interact with co-workers and supervisors, and respond appropriately to changes in the work setting. The transcript states "no audible response"

to the question.[4]  Dr. Bentham further stated that he agreed with the rating of Plaintiff's limitations concerning pace and concentration as moderate.[5]  The ALJ then asked Dr. Bentham whether Plaintiff could do simple work, and he responded "yes."[6]

Later in the hearing, Dr. Bentham was recalled to testify.  Plaintiff's counsel stated that she was confused as to whether his opinion was that Plaintiff's mental residual functional capacity was limited to simple and asked if Plaintiff could do detailed and complex tasks.  Dr. Bentham responded by reading Dr. Curtis' mental RFC that Plaintiff can understand, remember, and carry out detailed instructions, make detailed decisions, concentrate for extended periods, interact with co-workers and supervisors, and can respond to changes in routine.[7]  Dr. Bentham testified that Dr. Curtis' report reflects that Plaintiff can perform work with detailed instructions, but not complex.[8]  When counsel stated that Dr. Bentham previously stated Plaintiff would be lowered to simple, Dr. Bentham stated, "[n]o, I didn't say that."[9]

Dr. Bentham's testimony does not show an inconsistency.  The record does not show that he said Plaintiff could only do simple work, only that he responded affirmatively when asked if Plaintiff could perform simple work.  His conclusion that Plaintiff could perform work with detailed instructions is consistent with and supported by the medical record.

Moreover, while Plaintiff asserts that it was improper for the ALJ to ask Dr. Bentham whether Plaintiff could go back to being a claims clerk, his written decision reveals that he properly relied upon the vocational expert's testimony and opinion, combined with the medical evidence

---

[4] *See* Administrative Record, ECF 11-2, at *28.
[5] *Id*.
[6] *Id*.
[7] *Id*. at *31.
[8] *Id*. at *31–32.
[9] *Id*. at *32.

and testimony, to determine that Plaintiff could perform her past work.  This claim of error lacks merit.

**CONCLUSION**

For the reasons above, the ALJ's findings are supported by substantial evidence and the ALJ applied the correct legal standards.  The Commissioner's decision should be affirmed and the complaint should be dismissed.  It is therefore

**ORDERED** that the the Commissioner's final decision is **AFFIRMED** and the complaint is **DISMISSED** with prejudice.

So ORDERED and SIGNED this 9th day of August, 2017.

K. NICOLE MITCHELL
UNITED STATES MAGISTRATE JUDGE